# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | Hon. Joseph A. Dickson |
| KEVIN DOWD | : | Case No.: 13-6515 |

I, Abigail M. Weidner, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached page and made a part hereof.

*(signature)*
Abigail M. Weidner, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

January 23, 2013     at          Newark, New Jersey
Date                             City and State

HONORABLE JOSEPH A. DICKSON
United States Magistrate Judge          *(signature)*
Name & Title of Judicial Officer        Signature of Judicial Officer

## ATTACHMENT A

### Count One
### (Conspiracy to Commit Securities Fraud – Insider Trading)

From in or about November 2011 through in or about July 2012, in the District of New Jersey and elsewhere, defendant

### KEVIN DOWD

did knowingly and willfully combine, conspire and agree with others to commit offenses against the United States, namely, securities fraud, by using and employing by the direct and indirect use of the means and instrumentalities of interstate commerce and the mails, in connection with the purchase and sale of securities, manipulative devices, including the purchases and sales of securities of issuers on the basis of material nonpublic information about those securities and issuers, in breach of a duty of trust and confidence that was owed directly, indirectly, and derivatively, to the issuers of those securities, the shareholders of those issuers, and to other persons who are the source of the material nonpublic information, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2.

### Overt Acts

In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

1. On or about November 18, 2011, defendant DOWD called co-conspirator "J.F." and provided J.F. material nonpublic information concerning Gilead Sciences, Inc. ("Gilead")'s impending acquisition of Pharmasset, Inc, which defendant DOWD had obtained in the course of his employment as a financial advisor at a global wealth management firm.

2. On or about November 18, 2011, co-conspirator J.F. caused approximately $196,000 to be transferred into a brokerage account he controlled at brokerage firm headquartered in New Jersey.

3. On or about November 18, 2011, co-conspirator J.F. called co-conspirator "E.B." and relayed information to him concerning Pharmasset.

4. On or about November 18, 2011, co-conspirator J.F. placed a purchase order for 2,700 shares of Pharmasset stock, which was entered through a brokerage firm located in New Jersey.

In violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Abigail M. Weidner, have been a Special Agent of the Federal Bureau of Investigation ("FBI") for approximately four and a half years. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained from other sources, including: a) statements made or reported by various witnesses with knowledge of relevant facts; b) my review of publicly available information; and c) documents, including telephone records, brokerage records and business records obtained from various entities. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the content of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## RELEVANT PARTIES AND ENTITIES

1.  At all times relevant to this Complaint unless otherwise indicated:

    a.  Gilead was a biotechnology company based in Foster City, California, and was engaged in the business of developing, manufacturing and marketing antiviral drugs to treat patients infected with HIV, hepatitis B and influenza. Gilead's stock was registered with the U.S. Securities and Exchange Commission, and was publicly traded on the NASDAQ stock exchange.

    b.  Pharmasset was a pharmaceutical company based in Princeton, New Jersey, and was engaged in the business of developing, manufacturing and marketing antiviral drugs. From in or about April 2007 through in or about January 2012, Pharmasset's stock was registered with the U.S. Securities and Exchange Commission, and was listed on the NASDAQ stock exchange. On November 21, 2011, Gilead publicly announced that it was acquiring Pharmasset for $11 billion, or $137 per share; the acquisition was completed in or about January 2012.

    c.  NASDAQ was the second-largest equity securities trading market by market capitalization in the world. NASDAQ did not have a central trading floor. Instead it relied on computer servers to facilitate all trading activity. Since at least 2006, NASDAQ maintained computer servers in Carteret, New Jersey, through which trades of NASDAQ-listed stocks were executed.

    d.  "Brokerage Firm A" was a global wealth management firm, which provided access to a wide range of products and services to individuals, businesses and institutions, including brokerage and investment advisory services, financial and wealth planning, credit and lending, cash management, annuities and insurance, retirement and trust services. Brokerage Firm A had offices internationally, and throughout the United States, including a branch office in Aventura, Florida (the "Aventura Branch").

    e. "Director" served as a member of Pharmasset's Board of Directors from in or about August 2000 through in or about January 2012, and was the largest customer of Brokerage Firm A's Aventura Branch.

    f. "Managing Director" was a Managing Director at Brokerage Firm A's Aventura Branch, and provided investment, tax and estate planning advice to Director

    g. "Senior Vice President" was a Senior Vice President and Portfolio Manager at Brokerage Firm A's Aventura Branch, and also provided investment, tax and estate planning advice to Director

    h. "Group Administrator" was an Assistant Vice President and Group Administrator at Brokerage Firm A's Aventura Branch, and supervised the administrative and support staff at the Aventura Branch, as well as handled client relationships and managed municipal bond investments for clients.

    i. Defendant KEVIN DOWD was a registered representative in Brokerage Firm A's Aventura Branch and held the titles of Second Vice President and Financial Advisor. Defendant DOWD joined Brokerage Firm A in or about 2005 and worked there through late October 2012. Among other things, defendant DOWD developed insurance strategies for sophisticated estate planning purposes for the Aventura Branch's clients, assisted in the development of asset allocation recommendations for clients, and was responsible for equity trading at the Aventura Branch. Defendant DOWD reported to Managing Director and Senior Vice President

    j. Co-conspriator J.F. was defendant DOWD's childhood friend, and resided in or around Del Ray Beach, Florida. Among other things, J.F. operated "Company A", which maintained a brokerage account with a brokerage firm headquartered in Shrewsbury, New Jersey ("Brokerage Firm B"). J.F. previously worked at a penny stock promotion company in Boca Raton, Florida (the "Stock Promotion Company") from approximately in or about 2000 to approximately in or about late 2006, where defendant DOWD also worked between in or about May 2000 through in or about July 2001.

    k. Co-conspriator E.B. resided in or around Boca Raton, Florida, and among other things, was the vice president of "Company B", a business based in Boynton Beach, Florida. E.B. worked at the Stock Promotion Company with co-conspirator J.F. from approximately in or about 2003 through in or about 2005, and knew defendant Dowd.

**Brokerage Firm A's Policies Concerning Insider Trading**

  2. At all times relevant to this Complaint, defendant DOWD owed Brokerage Firm A a fiduciary duty and a duty of trust and confidence to keep confidential any information he received from his employer or from the firm's customers, and not to trade or pass on any

material nonpublic information he received during the course of his employment at Brokerage Firm A.

3.  Brokerage Firm A had policies in place, which expressly informed its employees about the legal prohibitions against "insider trading," and warned its employees of the criminal penalties for such conduct. These policies were communicated to defendant DOWD on multiple occasions during his employment at Brokerage Firm A, including through on-line training modules which he completed between 2011 and 2012.

4.  Brokerage Firm A's "Global Policy on Confidential and Material Non-Public Information," which was provided to defendant DOWD, defined material nonpublic information as "all non-public information that may have a significant impact on the price of a security or that a reasonable investor would be likely to consider important in making an investment decision." According to the policy, material non-public information included "significant undisclosed business activities (*e.g.* proposed or agreed mergers, acquisitions, divestitures, major investments, restructurings, refinancings, extraordinary borrowings or even, in certain circumstances, the retention of an investment bank).

5.  The policy also explicitly warned: "[y]ou may never, under any circumstances, trade, encourage others to trade, or recommend securities, derivatives or other financial instruments while in possession of material non-public information."

**Gilead Sciences's Acquisition of Pharmasset**

6.  On or about September 2, 2011, Gilead made an initial offer to acquire Pharmasset for $100 per share in cash, and this confidential information was communicated to Pharmasset's board of directors and key executives.

7.  On or about October 12, 2011, Gilead increased its offer to $125 per share in cash, and this confidential information was communicated to Pharmasset's board of directors and key executives. Thereafter, Pharmasset engaged in a limited auction process under confidentiality agreements whereby it solicited acquisition offers from a number of other large pharmaceutical companies for a limited period of time.

8.  On or about November 17, 2011, however, Gilead increased its offer to $135 per share in cash. Thereafter, on November 18, 2011, Pharmasset's board of directors, and certain key executives based in Pharmasset's Princeton, New Jersey headquarters convened a telephone conference call to review Gilead's latest offer. At that time of the call, Director was in New Jersey and participated in the conference call. Also on that date, Director made a series of calls to his advisers at Brokerage Firm A.

9.  Between November 19, 2011 and November 20, 2011, Pharmasset's management informed Gilead that it would accept an offer to be acquired for $137 per share in cash. Thereafter, Gilead also agreed to consummate the deal at that price.

10. At approximately 7:00 a.m. on November 21, 2011, Gilead publicly announced that it had entered into an agreement with Pharmasset to acquire the company for approximately $11 billion, or $137 per share in cash. The purchase price represented an approximately 89% premium over Pharmasset's closing price of $72.67 on November 18, 2011. In response to the announcement, Pharmasset's stock price increased to $134.14 per share at the close of trading on November 21, 2011. The acquisition was completed in or about January 2012.

11. Prior to the November 21, 2011 public announcement, Gilead's offers to acquire Pharmasset and its impending acquisition of Pharmasset at $137 were not generally known or available to the public.

**Defendant DOWD's Receipt of Material Nonpublic Information Concerning Gilead's Acquisition of Pharmasset and Tipping of Co-conspirators Who Traded on the Information**

12. Between in or about September 2011 and October 2011, Director informed Senior Vice President, who advised Director on investment, tax and estate planning matters, that Pharmasset was going to be sold, and that it was in the process of soliciting acquisition offers from large pharmaceutical companies. Director provided Senior Vice President this information in confidence.

13. Shortly thereafter, Senior Vice President informed defendant DOWD that Pharmasset was in the process of being sold to another pharmaceutical company. In addition, during a team meeting, defendant DOWD's supervisors – Managing Director and Senior Vice President – informed defendant DOWD and Group Administrator, in sum and substance, "we are over the wall on Pharmasset," and that they could not trade or recommend Pharmasset stock as a result of the information they received from Director. Senior Vice President also instructed defendant DOWD, who sometimes entered trades for Managing Director, to make sure that Managing Director did not mistakenly trade in Pharmasset from that point forward.

14. In or about the week of November 14, 2011, prior to Gilead's public announcement of its acquisition of Pharmasset, Director informed Senior Vice President in confidence that the final acquisition price of Pharmasset was going to be in the high $130s per share. Then before the November 21, 2011 public announcement, Senior Vice President informed several key employees, including defendant DOWD that the final purchase price of Pharmasset was going to be in the high $130s per share, and reiterated that they could not recommend Pharmasset or trade in it.

15. After receiving the material nonpublic information described above, defendant DOWD made several telephone calls to co-conspirator J.F. on Friday, November 18, 2011. Following these telephone calls, co-conspirator J.F. either called or texted co-conspirator E.B. on multiple occasions. J.F. and E.B. then engaged in the following transactions on the basis of material nonpublic information provided by defendant DOWD:

4

      a.    Co-conspirator J.F. transferred approximately $196,000 into a Company A brokerage account that he controlled at Brokerage Firm B. Prior to this transfer, the account balance in the account was zero and the account had been dormant for months.

      b.    Following the transfer, at approximately 1:29 p.m., co-conspirator J.F. purchased 2,700 shares of Pharmasset stock at $71.89 per share for a total of $195,808. These trades were entered through Brokerage Firm B's New Jersey headquarters.

      c.    At approximately 1:32 p.m. – three minutes after co-conspirator J.F.'s purchase of 2,700 Pharmasset shares, co-conspirator E.B. began purchasing highly speculative Pharmasset "out-of the money" call options[1] in a Company B brokerage account that he controlled. Specifically, co-conspirator E.B. purchased: 50 $75.00 Pharmasset December 2011 "out-of the money" call option contracts at prices between $2.98 to $3.20, and 50 $80 Pharmasset December 2011 "out-of the money" call option contracts at prices between $1.65 to $1.67.

16.    At approximately 7:04 a.m. on November 21, 2011, just minutes after the 7:00 a.m. public announcement that Gilead would purchase Pharmasset at $137 per share in cash, defendant DOWD called co-conspirator J.F. twice. Then, between 7:47 a.m. and 8:49 a.m., co-conspirators J.F. and E.B. placed approximately seven calls to each other.

17.    Also on Monday, November 21, 2011, following the public announcement of Gilead's acquisition of Pharmasset:

      a.    At approximately 10:23 a.m., co-conspirator J.F. sold all 2,700 of the Pharmasset shares he purchased in Company A's account at $134.16 per share, or for a total of $359,429, netting him an illegal profit of approximately $163,621. These trades were entered through Brokerage Firm B's New Jersey headquarters.

      b.    Between approximately 10:44 a.m. and 11:04 a.m., co-conspirator E.B. sold all of the Pharmasset call options he purchased in the Company B brokerage account for an illegal profit of approximately $544,706.

---

[1] An "option" is an instrument that gives the owner the right to buy or sell a specified number of shares of a specified stock at a certain price within a specified period. A "call" option allows the option holder to buy the underlying stock at a set price – the "strike price" – at any time up to the expiration date of the contact. An "out-of-the-money" call option has a strike price that is higher than the current market price of the underlying stock and is valueless unless the price of the underlying stock price rises above the strike price before the expiration date of the contract. An option is a security and is subject to the same regulatory scheme that governs trading in other forms of securities.

**Co-conspirator J.F.'s Gifts to Defendant DOWD**

18. Around the time co-conspirator J.F. purchased the 2,700 shares of Pharmasset stock discussed above, he agreed to give defendant DOWD a wooden dock to use for his jet skis; thereafter, co-conspirator J.F. gave defendant DOWD the promised dock.

19. After co-conspirator J.F. netted approximately $163,621 in illegal profit from his trades in Pharmasset, he gave defendant DOWD a cashier's check dated January 3, 2012 in the amount of $35,000, which was deposited into a bank account controlled by defendant DOWD on or about January 5, 2012. Defendant DOWD used the $35,000 in connection with an in-ground pool that he was having built at his home.

**Defendant DOWD's Efforts to Conceal His Criminal Conduct**

20. On or about July 31, 2012, FBI agents interviewed defendant DOWD outside his home in Boca Raton, Florida. At the outset of the interview, defendant DOWD was informed that he was being interviewed in connection with a grand jury investigation in the District of New Jersey. During the interview, defendant DOWD was asked whether he ever learned of the impending sale of Pharmasset during the course of his work at Brokerage Firm A. Defendant DOWD falsely responded that the impending acquisition of Pharmasset was never discussed at Brokerage Firm A, and falsely stated that he had no information that Pharmasset was going to be acquired at a premium price. Defendant DOWD did, however, admit recommending Pharmasset to co-conspirator J.F. in October or November 2011.